UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| ELLA MAE BENSON, | ) | CIV.  05-4088-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER GRANTING |
| vs. | ) | DEFENDANT'S MOTION FOR |
| | ) | PARTIAL SUMMARY JUDGMENT |
| MICHAEL J. GIORDANO, M.D., | ) | |
| | ) | |
| Defendant. | ) | |

Defendant, Michael J. Giordano, M.D., moves for partial summary judgment in regards to the punitive damages claim.  Plaintiff, Ella Mae Benson, opposes the motion.  The motion is granted.

**FACTUAL BACKGROUND**

On June 27, 2003, Dr. Giordano performed back surgery on Benson to fuse her L5-S1 vertebrae.  He performed a minimally invasive surgery by using the Sextant System.[1]  During the surgery, there was a misplacement of the left S1 sacral pedicle screw.[2]  Although one of the

---

[1] The Sextant System is a procedure that allows the surgeon to connect pedicle screws that have been inserted along the spine with a rigid rod in order to stabilize the intervening motion segments.  See Docket 105-3.

[2] The misplacement of a screw is identified as a possible risk on consent forms used for surgeries such as that performed on Benson.

intraoperative x-rays did not demonstrate that the pedicle screw was misplaced, another one of the intraoperative x-rays, which was slightly rotated, showed that the screw was too medial.  Following the surgery, on June 28, 29, and 30, 2003, Benson complained to Dr. Giordano of leg pain. Dr. Giordano thought that the leg pain was common, that it may be caused by nerve root traction, and that it should resolve.  But on July 14, 2003, after Benson complained of leg pain again, Dr. Giordano ordered a CT myleogram. The CT myleogram revealed the medially placed screw.  As a result, Dr. Giordano, along with Dr. Purves, performed a second surgery, using an open surgery technique, to remove and replace the misplaced pedicle screw.

Dr. Giordano became interested in using the Sextant System surgery technique.  When learning the technique, Dr. Giordano wanted to go beyond his training of practicing the technique on sawbones and a mannequin or relying on a step-by-step guide, and wanted to see a procedure using the Sextant System done in person.  Dr. Giordano, however, was not aware of any cadaver training available at the time.  In the summer of 2002, Dr. Giordano went to Chicago for training and observed two three- to four-hour Sextant System surgeries.  Although he did not actually participate in the surgeries, Dr. Giordano was scrubbed in and present in the operating room with the

Chicago surgeon doing the surgeries.  Dr. Giordano also had discussions with the Chicago surgeon regarding the "pitfalls" and "pearls" of the system.

Dr. Giordano explained that he tried the Sextant System surgery procedure on Benson because he wanted to try to put her through a smaller surgery, not an open surgery.  Dr. Giordano had used the Sextant System on other patients with successful results.  But Benson's case was much tougher than Dr. Giordano's previous surgeries and he is not sure why.  After Benson had an unfavorable event caused by the Sextant System surgery procedure, Dr. Giordano decided that a small incision is not worth performing the Sextant System procedure.  He believed that he was much safer and much more comfortable placing screws while performing open surgery and, as a result, he stopped utilizing the minimally invasive pedicle screw procedures, including the Sextant System procedure.

On January 9, 2007, Benson filed an amended complaint alleging that Dr. Giordano was negligent in performing surgery upon her and that he was negligent in following up on that surgery.  Benson also asserted that Dr. Giordano's conduct demonstrated malice because he acted willfully or wantonly to the injury of her and, as a result, she was entitled to punitive damages.  Docket 48.  Dr. Giordano denied these allegations.  Docket 49.

**STANDARD OF REVIEW**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Summary judgment is not appropriate if a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. Vette Co. v. Aetna Cas. & Sur. Co., 612 F.2d 1076, 1077 (8th Cir. 1980). The nonmoving party may not, however, merely rest upon allegations or denials in its pleadings, but must set

4

forth specific facts by affidavits or otherwise showing that a genuine issue exists.  Forrest v. Kraft Foods, Inc., 285 F.3d 688, 691 (8th Cir. 2002).

## DISCUSSION

Under South Dakota law, claims for punitive damages are prohibited unless expressly authorized by statute.[3]  SDCL 21-1-4.  Punitive damages are authorized by SDCL 21-3-2, which provides in pertinent part:

> In any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, actual or presumed, . . . the jury, in addition to the actual damage, may give damages for the sake of example, and by way of punishing the defendant.

Thus, punitive damages are appropriate when the defendant has acted with oppression, fraud, or malice.

Under SDCL 21-3-2, the jury may award punitive damages for either actual or presumed malice.  "Actual malice is a positive state of mind, evidenced by the positive desire and intention to injure another, actuated by hatred or ill-will towards that person."  Harter v. Plains Ins. Co., 579 N.W.2d 625, 634 (S.D. 1998).  Presumed malice does not require hatred or ill will, but is present when a person acts willfully or wantonly to the injury of others.  Case v. Murdock, 488 N.W.2d 885, 891 (S.D. 1992).  Willful and wanton

---

[3] South Dakota substantive law governs this diversity action.  See Smith v. Tenet Healthsystem SL, Inc., 436 F.3d 879, 886 (8th Cir. 2006).

5

misconduct is when a person acts or fails to act when the person knows, or should have known, that injury is likely to occur.  Holzer v. Dakota Speedway, Inc., 610 N.W.2d 787, 793 (S.D. 2000).  See also South Dakota Pattern Jury Instruction 14-01.  Presumed malice also "implies that the act complained of was conceived in the spirit of mischief or of criminal indifference to civil obligations."  Dahl v. Sittner, 474 N.W.2d 897, 900 (S.D. 1991).  Further, a claim for presumed malice can be sustained by demonstrating "willful and wanton misconduct that indicates a reckless disregard for one's rights."  Flockhart v. Wyant, 467 N.W.2d 473, 478 (S.D. 1991).

Significantly, "[m]ere negligence is not equivalent to willful and wanton misconduct."  Brown v. Youth Services Intern. of South Dakota, Inc., 89 F. Supp. 2d 1095, 1107 (D.S.D. 2000).  Unlike negligence, "[w]illful and wanton misconduct demonstrates an affirmative, reckless state of mind or deliberate recklessness on the part of the defendant."  Id.  Further, punitive damages are awarded for the purpose of deterring the person "against whom they are awarded from repeating the offense and others from committing it."  Grynberg v. Citation Oil & Gas Corp., 573 N.W.2d 493, 504 (S.D. 1997).

The only South Dakota Supreme Court case specifically addressing whether punitive damages are appropriate in a medical malpractice lawsuit that the parties or the court is aware of is Baxter v. Campbell, 97 N.W. 386

6

(S.D. 1903).  In <u>Baxter</u>, the plaintiff alleged that the defendant doctor was careless and negligent when he treated the plaintiff's leg.  More specifically, the plaintiff claimed that the defendant doctor used a method that was twenty-five years old and not approved at the time he set the plaintiff's leg. The South Dakota Supreme Court determined that an instruction regarding punitive damages was improper because there was nothing in the conduct of the doctor from which malice could be presumed.  <u>Id.</u> at 386-87.  The court explained that "[i]n order to justify the imputation of malice, within the rule of punitive damages, the injury must have been conceived in a spirit of mischief, and partake of a criminal or wanton nature."  <u>Id.</u> at 387.  The court further explained that "[a]s applied to torts, an act, in order to be malicious, must be wrongful, and intentionally done, with an evil mind, and a wish to injure another."  <u>Id.</u>  The court concluded that because there was nothing in the complaint or the evidence from which malice could be presumed, the jury instruction regarding the imposition of punitive damages was improper.  <u>Id.</u> at 388.

More recently, the South Dakota Supreme Court has addressed what constitutes presumed malice for purposes of punitive damages in the context of a variety of claims, including bad faith, intentional infliction of emotional distress, fraud, and driving an automobile while under the influence of

alcohol.  In these cases, the court has found that the defendant's conduct demonstrated a disregard for the rights of others and that the defendant did something that he realized would produce a certain result and would bring harm to the plaintiff.  See Biegler v. American Family Mut. Ins. Co., 621 N.W.2d 592 (S.D. 2001) (determining that punitive damages were proper in a bad faith law suit brought against an insurance company because the company acted in the spirit of mischief or criminal indifference to its civil obligation to the insured when it denied coverage, which was sufficient to constitute presumed malice); Harter v. Plains Ins. Co., 579 N.W.2d 625 (S.D. 1998) (determining that punitive damages were proper in a bad faith law suit when there was sufficient evidence submitted to demonstrate that the defendant insurance company acted with presumed malice when the company allegedly failed to tender the policy limits of its insured's underinsured motorist policy); Kjerstad v. Ravellette Publications, Inc., 517 N.W.2d 419 (S.D. 1994) (determining that punitive damages were proper in an intentional infliction of emotional distress and invasion of privacy law suit because substantial evidence existed to show that the defendant acted with presumed malice by allegedly spying on employees in the restroom); Isaac v. State Farm Mut. Auto. Ins. Co., 522 N.W.2d 752 (S.D. 1994) (determining that punitive damages were proper in a bad faith law suit because evidence existed that the

insurance company acted with presumed malice by denying the insured's claim for uninsured motorist coverage); <u>Dahl v. Sittner</u>, 474 N.W.2d at 900 (determining that because enough evidence had been submitted to satisfy the elements of fraud, the defendant's conduct rose to the level of presumed malice and, therefore, punitive damages were appropriate); and <u>Flockhart v. Wyant</u>, 467 N.W.2d 473 (S.D. 1991) (determining that the defendant acted with presumed malice and, therefore, punitive damages were proper because the defendant drove her vehicle with a blood alcohol content of 0.30%; had prior convictions for alcohol related offenses; completed in-patient alcohol treatment; received instructions and warnings in drunk driving classes; and was warned on numerous occasions about the danger she placed other motorists in by drinking and driving).  As demonstrated by its jurisprudence, "South Dakota requires more egregious conduct than . . . states which require proof of conduct more egregious than gross negligence, but which do not require proof of malice [and] [t]hus South Dakota is among the states having the most stringent conduct requirement."  <u>Bierle v. Liberty Mut. Ins. Co.</u>, 792 F. Supp. 687, 691 (D.S.D. 1992).

I.     **Dr. Giordano's Statements**

Dr. Giordano argues that summary judgment is proper on the punitive damages claim in this case because he did not recognize the misplaced pedicle screw during the surgery and his current acknowledgment that an x-ray shows misplacement of the pedicle screw does not constitute willful, wanton, or malicious conduct.  Dr. Giordano also argues that his deposition testimony, which included a statement that in retrospect he probably should have converted to open surgery when he realized he was having trouble using the Sextant System, does not justify imposition of punitive damages.  Dr. Giordano further argues that the fact that he abandoned the Sextant System procedure after Benson's surgery does not show willful, wanton, or malicious behavior but rather demonstrates that he made the decision for the benefit of his patients.

Benson responds that summary judgment on her punitive damage claim is not proper because Dr. Giordano's admissions to repeated errors in judgment, when considered together, demonstrate that there is a reasonable basis to believe that there has been willful, wanton, or malicious conduct. Benson argues that Dr. Giordano's failure to recognize that the x-ray was "rotated" during surgery and that the screw was misplaced are evidence of Dr. Giordano's reckless disregard for Benson's rights and therefore support

10

punitive damages.  Benson also argues that the fact the experts have testified

that Dr. Giordano's placement of the screw was egregious and that

Dr. Giordano stopped using the Sextant System procedure after Benson's

surgery shows that Dr. Giordano's conduct was wanton.  Benson further

argues that Dr. Giordano could have stopped using the Sextant System

procedure during Benson's surgery when he started having problems with it

and switched to the open surgery methodology.

During his deposition, Dr. Giordano testified that the lateral view film,

which he relied upon during surgery, did not show the misplacement of the

pedicle screw, but that the other film, which was slightly rotated, showed that

the screw was not correctly placed.  Docket 91, at 59.  The fact that

Dr. Giordano only looked at the lateral view film during surgery may

demonstrate that he deviated from the required standard of care, but it does

not evidence willful and wanton misconduct that indicates a reckless

disregard for Benson's rights.  Also, while one of Benson's expert witnesses

believes that "the malposition [of the pedicle screw was] egregious and should

have been identified intraoperatively or immediately postoperatively" and that

"it is indefensible to not address this complication in an appropriate and

timely manner," such opinions are related to whether Dr. Giordano was

negligent when he misplaced the pedicle screw during Benson's surgery, not

11

whether he was acting willfully or wantonly to the injury of her.  Docket 105-10, at 1.  Importantly, South Dakota has one of the most strict conduct requirements for purposes of punitive damages.  The conduct must be with malice, which is a more stringent requirement than gross negligence or even conduct that is more egregious than gross negligence.  Therefore, even if Dr. Giordano's conduct was egregious, it was not with malice because there was no evidence presented to suggest that Dr. Giordano knew or should have known that injury to Benson was likely to occur.

Moreover, the fact that Dr. Giordano did not stop using the Sextant System procedure during Benson's surgery when he realized he was struggling with the procedure does not warrant instructing the jury with regard to punitive damages in this case.  Dr. Giordano stated that he had no explanation for why he did not stop using the Sextant System on Benson when he realized that he was having so much trouble.  Dr. Giordano also stated that in retrospect, he thinks he probably should have just converted it to open surgery and that there was no reason why he could not have converted to open surgery.  These statements do not indicate that Dr. Giordano acted willfully and wantonly when he continued using the Sextant System during Benson's procedure.  In other words, the evidence does not support a finding that Dr. Giordano realized that his conduct would produce a certain result

12

and would harm Benson.  Instead, at the most, these statements may illustrate that he acted negligently when performing Benson's surgery with the Sextant System procedure.

Similarly, the fact that Dr. Giordano stopped using the Sextant System procedure after the adverse results of Benson's surgery is not sufficient to support an award of punitive damages.  The statements that Dr. Giordano made about not using the Sextant System procedure after Benson's surgery because he "was much safer and much more comfortable putting [pedicle screws] in [using] open [surgery]" do not imply that his performance of Benson's surgery was done willfully or wantonly to the injury of Benson. Additionally, such statements do not indicate that Dr. Giordano knew or should have known that using the Sextant System would likely result in injury to Benson.  Rather, they show that after Dr. Giordano realized he injured a patient, he discontinued that procedure so that future patients would not be injured.

While the above discussed statements made by Dr. Giordano may show that he was negligent in his performance of Benson's surgery, they do not demonstrate that he performed surgery on Benson with a reckless disregard for Benson's rights.  Even when coupled together, such statements do not demonstrate that Dr. Giordano knew or should have known that injury to

13

Benson was likely to occur as a result of using the Sextant System during Benson's surgery.  Thus, even when viewing the facts in the light most favorable to Benson, Dr. Giordano's statements do not provide a reasonable basis on which to award punitive damages.

## II.    Dr. Giordano's Lack of Adequate Training

Dr. Giordano argues that because he has performed eight to twelve successful surgeries using the Sextant System technique and he had no evidence before him, prior to Benson's surgery, that he would have difficulty with the technique he used on her, there is no evidence that his conduct was willful, wanton, or malicious.  Dr. Giordano also asserts that Benson's allegations that he performed the surgery with a lack of fundamental understanding of the Sextant System does not warrant punitive damages.

Benson responds that the number of egregious errors that Dr. Giordano committed during her surgery demonstrates that he lacked an understanding of how to perform it.  Benson asserts that the fact that Dr. Giordano only attended a week-end training seminar coupled with the fact that he recognized the difficulty he was having with the procedure mid-surgery would render a reasonable jury able to find the requisite mental state for punitive damages.

Dr. Giordano's training in relation to the Sextant System procedure consisted of observing two three- to four-hour surgeries in Chicago.

14

Dr. Giordano also had discussions with the Chicago surgeon about the Sextant System procedure.  At his deposition, Dr. Giordano testified that he had used the Sextant System procedure on other patients and that they "had done very well."  Docket 91, at 83.  As a result, he decided to use the Sextant System for Benson's surgery not only because it was a less invasive surgery but also because he believed that she would do well with the procedure, like his other patients.  Id.

        The fact that Benson alleges that Dr. Giordano lacked adequate training in relation to the Sextant System does not necessitate punitive damages.  This case is distinguishable from the South Dakota cases mentioned above, in which the court found that punitive damages were appropriate.  Unlike those cases, where the defendant knew or should have known that injury was likely to occur as a result of his conduct, here, Dr. Giordano was not aware that his use of the Sextant System would likely harm Benson.  In fact, Dr. Giordano's prior Sextant System surgeries were successful and he chose to use the Sextant System while operating on Benson because such procedure was minimally invasive and only involved small incisions.  Id.  No evidence exists to suggest that Dr. Giordano knew or should have known that injury to Benson was likely to occur as a result of his use of the Sextant System.  Thus, even when construing the facts in the light most favorable to Benson, Benson

has failed to identify any genuinely disputed material facts that would allow Benson to carry the heavy burden required in South Dakota to warrant punitive damages against Dr. Giordano.

### III.   Dr. Giordano's Failure to Promptly Diagnose and Treat Misplacement

Dr. Giordano argues that punitive damages are not appropriate in this case because he addressed Benson's condition as soon as he recognized the problem and that his expert witnesses believe that he satisfied the standard of care in regard to his treatment and care of Benson.  Dr. Giordano emphasizes that misplaced pedicle screws during the type of surgery Benson underwent are a recognized risk and that Benson's expert witnesses do not state anything about Dr. Giordano's conduct being willful, wanton, or malicious.

Benson responds that because Dr. Giordano knew that the surgery was difficult and that Benson immediately complained of leg pain after the surgery, Dr. Giordano should have known there was a problem with Benson.  Benson further argues that while mild misplacement of pedicle screws is a recognized risk of surgery, egregious misplacement warrants punitive damages.

After her June 27, 2003, surgery, Benson complained of leg pain on June 28, 29, and 30, 2003.  Dr. Giordano testified that he believed the leg pain was common and may be caused by nerve root traction and should

resolve.  A little over two weeks after the surgery, on July 14, 2003, Benson again complained of pain in her leg.  At this time, Dr. Giordano ordered a CT myelogram, which showed the medially placed pedicle screw.  Dr. Giordano, along with Dr. Purves, performed a second surgery to remove and replace the misplaced pedicle screw, using the open procedure.

Here, Dr. Giordano listened to Benson's complaints of pain immediately after her surgery but initially concluded her pain was indicative of something other than a misplaced pedicle screw.  There is no evidence that Dr. Giordano knew that Benson's pedicle screw was misplaced or that Benson was presenting symptoms absolutely indicative of a misplaced pedicle screw and that Dr. Giordano refrained from acting accordingly.  Benson has only shown that Dr. Giordano took certain actions that may or may not have been negligent, but has not shown that Dr. Giordano acted in a willful and wanton manner when he failed to promptly diagnose and treat the misplaced pedicle screw.

## IV.    Past Allegations of Malpractice

Dr. Giordano argues that Benson relies on past allegations of negligence against him because of the alleged similarity among these allegations of malpractice and the instant case to show punitive damages are proper. Dr. Giordano argues that such past allegations of negligence are inadmissible

17

because evidence of prior bad acts is routinely excluded as irrelevant in medical malpractice cases and as improper character and propensity evidence.

Benson responds that the two previous allegations of malpractice against Dr. Giordano show that he was on notice of the danger of the surgery and also on notice of the fact that he did "not have a good track record" when he operated on Benson.  Plaintiff's Brief, Docket 106, at 9.  Benson argues that such allegations are admissible because they prove Dr. Giordano had knowledge that he was doing something wrong when putting in pedicle screws.

Dr. Giordano has had prior malpractice complaints filed against him which have been settled.  Although these cases involved the misplacement of pedicle screws, they did not involve surgeries which used the Sextant System procedure.  Assuming, without deciding, that the two previous allegations of malpractice against Dr. Giordano are admissible, such allegations do not support punitive damages.  To support a claim for punitive damages, the circumstances of the two incidents must be sufficiently similar to raise an inference that the actor, aware of the first incident, must have consciously disregarded a risk that the harm would be repeated.  See, e.g., Kuta v. Newberg, 600 N.W.2d 280, 289 (Iowa 1999) (rejecting the plaintiff's argument for punitive damages in reliance on conclusion that two prior, unrelated accidents demonstrated that the defendant was unfit to drive) and Gulf Power

18

Co. v. Kay, 493 So. 2d 1067, 1074-75 (Fla. App. 1986) (reversing a punitive damages award for failing to remove a light pole based on evidence of prior accidents at the same location when prior accidents were not sufficiently similar).

Here, while Dr. Giordano misplaced pedicle screws in two previous cases, those cases involved Dr. Giordano performing open surgery rather than using the Sextant System procedure. Thus, while this case involves a misplaced pedicle screw, it also involves a different patient and a different surgical technique. As such, the two previous cases involving the misplacement of pedicle screws are not sufficiently similar to the events of this case to warrant the inference that Dr. Giordano consciously disregarded the risk that he may misplace a pedicle screw. If Dr. Giordano could be held liable for willful and wanton conduct in this case, then any doctor or surgeon would be subject to punitive damages if he had previously been accused of a similar medical malpractice allegation. Such an expansive definition is inconsistent with the heavy burden placed on plaintiffs in South Dakota to receive punitive damages. As a result, after viewing the facts in the light most favorable to Benson, the court finds that partial summary judgement must be granted on Benson's claim for punitive damages. Accordingly, it is hereby

19

ORDERED that defendant's motion for partial summary judgment (Docket 89) is granted.

Dated June 9, 2008.

BY THE COURT:


/s/ *Karen E. Schreier*

KAREN E. SCHREIER
CHIEF JUDGE

20